16431

GOMILLION v. FORSYTHE *ET AL.*

(62 S. E. (2d) 297)

212

*Messrs. Wise, Whaley & McCutchen,* of Columbia, *for* *Appellant,*

214

*Messrs. C. T. Graydon* and *A. T. Graydon,* of Columbia,
*for Respondents,*

November 16, 1950.

LIDE, Acting Associate Justice.

Willie Gomillion, a colored boy about 14 years of age, was killed on Monday, June 10, 1946, by reason of a fall from a Columbia Dairies milk truck. He did not die instantly, and was promptly taken to a hospital. However, he died before arrival there. At the time of the occurrence, which will for convenience be designated as an "accident" (without attempting to define that term), the decedent was riding in a milk truck driven by one J. L. Bell, who operated the

same in connection with the sale and delivery of milk, a product in which the respondents dealt, and they will frequently be referred to as the Columbia Dairies, that being their firm name. The truck was owned by them and inscribed upon it was their firm name, as follows: "Columbia Dairies, Permit 31, Phone 3171". Plaintiff's intestate was a helper of Mr. Bell in the handling and delivery of milk; and at the time of the accident the truck was returning from a delivery trip on the designated route travelled by Mr. Bell.

The plaintiff, the mother of Willie Gomillion, deceased, was duly appointed administratrix of his estate, and this action was instituted by her on August 29, 1946, to recover damages for his alleged wrongful death, under Lord Campbell's Act, embodied in Sections 411 and 412, Code 1942; the plaintiff as the mother of the decedent being the sole beneficiary. The complaint alleges that by reason of negligence and wilfulness of the driver and the improper equipment of the motor truck, damages were sustained in the sum of $10,000.00. There are twelve specifications of negligence and wilfulness, seven of which are directed to the conduct of Mr. Bell as the driver of the truck, and five of which relate to certain alleged defects in the equipment of the truck, as constituting a violation of the defendants' duty to provide a safe place to work for their servants, one of them being the plaintiff's intestate.

The answer of the defendants denies all allegations charging negligence or wilfulness on their part, and sets up by way of a second defense that the plaintiff executed a release discharging the defendants from any and all damages by reason of the death of the said Willie Gomillion, and that the consideration of the release was substantial, valuable and sufficient. A reply was duly filed by the plaintiff denying the allegations of the answer with reference to the release, but alleging that the plaintiff did sign some paper or instrument on or about June 10, 1946, and if this is the alleged release set up in the second defense of the answer, "then the same was obtained by fraud, misrepresentation, concealment, coer-

cion and duress and was signed at a time when plaintiff was unable to understand or know what she was doing".

The reply also alleges that on August 29, 1946, before the summons or complaint was served in this action, she tendered, through her agent, the sum of $385.00 to the defendants, which tender was refused, this being the cost of the funeral expenses of Willie Gomillion, deceased, the same having been paid by the defendants; and the plaintiff alleged on information and belief that this was the total consideration of the purported release obtained by the defendants from the plaintiff.

The case came on to be tried in the Court of Common Pleas for Richland County before Hon. G. Ducan Bellinger, Presiding Judge, and a jury, on May 6, 1948, and the testimony was taken in behalf of the respective parties amounting to a considerable volume. At the close of all the testimony the defendants moved for a directed verdict in their favor upon three grounds, which may be briefly stated as follows, to wit: 1. That there was no evidence of actionable negligence; 2. That the undisputed evidence showed that Mr. Bell was an independent contractor; and 3. That the amount tendered with regard to the release was not the correct amount.

The plaintiff thereupon moved that the Court do hold as a matter of law that Willie Gomillion, deceased, was an employee of the Columbia Dairies; and also that the release be stricken out as not constituting a release of Columbia Dairies, because it purports to release Mr. Bell only. But this motion was overruled.

The trial Judge held that as to the defendants' third ground a verdict could not be directed, because the plaintiff expressly denied in her testimony receiving the sum of $25.00 claimed by the defendants as having been paid by them, in addition to the sum of $385.00 above referred to. There does not seem to have been any discussion as to the first ground, relating to the merits of the action, and it is quite

clear that the motion was not granted on this ground, and indeed could not properly have been. In the course of the argument counsel for the defendants amended his motion by adding a further ground that the tender made by the plaintiff was not sufficient, because it was not made to Mr. Bell; and he also added the ground that the undisputed evidence in the case, "or the overwhelming weight of the evidence in the case", established the validity of the release.

Judge Bellinger held that a verdict should be directed in favor of the defendants, upon the ground that the release was valid in all respects; and also upon the ground that the relation of Mr. Bell to the Columbia Dairies was that of an independent contractor.

After the direction of a verdict in favor of the defendants, counsel for the plaintiff moved for a new trial, alleging error in the Court's ruling as to the release and upon the question of independent contractor; and also alleging that the trial Judge was in error in not holding the decedent "was an employee of the Columbia Dairies, without regard to the question of whether or not Mr. Bell was an independent contractor"; and there was another ground, to wit, that even if the release were valid, it was a release of Mr. Bell and not of the Columbia Dairies. The motion was overruled.

The plaintiff in due course took this appeal from the judgment of the Circuit Court on five exceptions, raising two questions which we state and will discuss in this order: 1. Was the release valid and binding? 2. Was J. L. Bell an independent contractor or an employee of Columbia Dairies?

*Question 1. Was the release valid and binding?*

After a careful study of all the testimony in the cause, in view of the established principle that in the determination of whether a verdict should be directed the evidence must be considered in the light most favorable to the adverse party, our conclusion is that the trial Judge erred in directing a verdict upon this ground, and that the

evidence required the submission of this issue to the jury. In other words, we hold that there is material evidence in the record which, if true, would tend to establish in the mind of a reasonable juror that the release was invalid and without force or effect. *Cox v. McGraham,* 211 S. C. 378, 45 S. E. (2d) 595.

It is therefore necessary for us to refer to certain parts of the testimony, in order to show the grounds upon which our conclusion is based; even though such testimony is contradicted, modified or explained by or in behalf of the defendants. And we turn first to the testimony of the plaintiff herself, from which it appears that shortly after the accident she was informed of the same by Mr. Bell, who was accompanied by Mr. Martin, designated as a route foreman of the Columbia Dairies; and she went with them to the hospital, and upon arriving there learned that her son was dead; and the body was sent to Manigault's Funeral Home.

We now quote the following from the transcript of her testimony relating to what occurred after she returned from this trip to her home:

"Q. What happened after you got home? A. Mr. Forsythe and Mr. Bell came that afternoon, on Monday, and said, 'How are you feeling?' and I said, 'I am not able to get up,' and they went on off, and said, 'I will be back to see you in the morning.' They came back on Tuesday, and I was still in bed, and Mr. Forsythe said, 'Mattie, now get up, and get yourself together, and let's get through with this, and get it over. I want to let you know that Sonny wasn't work(ing) for me; he was working for Mr. Bell, and I am just helping Mr. Bell out, because he is a poor man.'

"Q. Because he is a poor man? A. Yes, sir.

"Q. What did you do then? A. I went back to bed, and Wednesday afternoon, Mrs. Manigault sent a boy after me, and I went to the funeral home, and when I got there, there was two white men and Mrs. Manigault there, and I signed a paper, but I don't remember—I don't remember signing

it. I signed it, but I don't remember what was done afterwards. I really wrote my name, but I don't know what was done afterwards."

She also testified to the effect that Mr. Forsythe, one of the defendants, (at her home and presumably on Tuesday), offered her $185.00 and told her (quoting) "that was all he was going to give me, because Sonny (the deceased) wasn't working for him, and he was only helping Mr. Bell out, because he was a poor man". She also testified that she never received $185.00 or any money from Mr. Forsythe or from Mr. Bell.

She further testified that the deceased, Willie Gomillion, was her main dependence; that out of his weekly wage of $5.00 he gave her (quoting) "$4.00 of his money to help with his little brothers and sisters, because I have no husband. I am a widow."

The undisputed testimony shows that the alleged release was signed by the plaintiff at the Manigault Funeral Home, to which she was taken on Wednesday afternoon, June 12, 1946, and that there were present W. A. Plott, Coroner of Richland County, Annie Mae Manigault, the undertaker, S. B. Forsythe, one of the defendants, and B. E. Smyrl, office manager for the Columbia Dairies, all of whom testified in behalf of the defendants; but Mr. Bell was not there. The plaintiff did not have with her any of her people or any of her friends, and her testimony was to the effect that she came alone, although her nephew wanted to go with her, (quoting) "but Mr. Forsythe said for nobody to come with me when I came to the funeral home". The plaintiff was able to read and write, having reached the tenth grade, and we quote the following from her testimony with reference to the signing of the paper, which was signed about 48 hours after the death of her son, and his body was then in the adjoining morgue: "The paper was already in Manigault's Funeral Home when I got there, and he said, 'Mattie, you sign this right here.' "

\* \* \*

"Q. Did you read the paper over that you signed? A. I can read, but I was so upset that I didn't have mind enough to read it.

"Q. I didn't ask you that; I asked did you read it? A. No, I didn't read it."

\* \* \*

"From Monday, the day my child got killed, up until Wednesday when I went to the funeral home, I hadn't slept for two days and two nights, and I was worried. I didn't have no insurance, and no help— \* \* \* I didn't know how my child was going to get buried".

The release was prepared by Mr. Smyrl, office manager of the defendants, on the afternoon of the death of the decedent, June 10, 1946, and was dated as of that day.

Judge Bellinger in ruling on this phase of the case stated: "Mattie testified that she understood all that was transpiring down there at the funeral home; that she did sign this paper; that she knew what it was for: that it was for the burial of her son; and that she didn't read it—that she could read, but that she didn't read it."

After the release was signed Mr. Forsythe paid to the undertaker the amount of the funeral expenses, in the sum of $385.00, which he said he paid for Mr. Bell. He also testified that the plaintiff asked for some additional money to obtain clothes for her children for use in connection with the funeral, and that he gave her the sum of $25.00 in cash, but as already stated, she expressly denied the receipt of this or any other amount.

We now make our final quotation from the transcript of plaintiff's testimony, as follows (the same being given on cross-examination) :

"Q. You selected the casket? A. I selected the casket?

"Q. Yes? A. Mrs. Manigault selected it.

"Q. Well, you agreed to it, didn't you? A. What else was I to do? I didn't have no way to bury him.

"Q. I asked you did you agree to it? A. Yes, sir.

"Q. You agreed to everything—that's right, isn't it? A. Yes, sir."

Judge Bellinger's ruling above quoted indicates that he thought she had agreed to everything that was done in connection with the release, but we do not think this inference from her testimony just quoted is a necessary one, in the light of the context, for it might be inferred that she meant to say that she agreed to the proposed funeral arrangements which the undertaker was then making. At all events, it was for the jury to determine the correct inference.

Referring to the testimony in behalf of the plaintiff with regard to her mental and physical condition, on Monday, after the death of her son, her niece, Edna Mickens, testified as follows: "She acted like she was nervous and upset, and was just patting her hands and wringing her hands, and crying and going on, and she wouldn't go to sleep. They put her in the bed, and she would get out and get back in."

She further testified that plaintiff's condition was practically the same on Tuesday and Wednesday. There was corroborating testimony by other witnesses for the plaintiff on this subject.

The allegations of the reply may be construed to ■ cover both "fraud in the factum" and "fraud in the treaty"; and we think there was some evidence as to each. Fraud in the factum, of course, relates to the matter of the manual signing of the paper, and if the plaintiff at the time she signed it had sufficient mental capacity to understand what she was doing, then there was no fraud in the factum.

But even if there was no fraud in the factum, there was testimony requiring submission to the jury of the issues arising out of alleged fraud in the treaty, which in modern times is more aptly called "fraud in the inducement or fraud in the procurement". The allegations of the reply in this

connection charge fraud by means of "misrepresentation, concealment, coercion and duress." ·

Referring first to fraud by means of misrepresentation, the testimony of the plaintiff hereinbefore quoted charges such misrepresentation on the part of the defendant S. B. Forsythe, to the effect that the deceased was not working for him, but was working for Bell, and that he was just helping Bell out because he was a poor man. The law relating to a fraudulent representation provides that to constitute actionable fraud (quoting) "it must appear: (1) That defendant made a material representation; (2) that it was false; (3) that when he made it he knew it was false, *or made it recklessly, without any knowledge of its truth and as a positive assertion*; (4) that he made it with the intention that it should be acted upon by plaintiff; (5) that plaintiff acted in reliance upon it; and (6) that he thereby suffered injury," *Halsey v. Minnesota-South Carolina Land & Timber Co.,* 174 S. C. 97, 177 S. E. 29, 37, 100 A. L. R. 1.

It could not. indeed be reasonably said that Mr. Forsythe *knew* that his statement with reference to the employment of the decedent was false, because that is a matter which has not yet been judicially determined, but it was for the jury to say, if such a statement was in fact made, whether or not the maker thereof made it as a positive assertion recklessly, without any knowledge of its truth; and also whether the other factors of misrepresentation were proven. Bad faith is the test of fraud. *Ex parte Hollman,* 79 S. C. 9, 60 S. E. 19, 21 L. R. A., N. S., 242.

The remaining issue relates to the charge of coercion on the part of the defendants. Coercion of the character considered is in the nature of fraud, because it means the exercise of such importunity and urgency of persuasion, or overpersuasion, as it is sometimes called, as to destroy the free agency of the party sought to be coerced, and to prompt him or her to do what is really against his

or her will. In other words, it must be such as to take away the free agency of the party sought to be coerced and substitute the will of another in the place of his or her own. This is what is sometimes called moral coercion, and is practically synonymous with undue influence. Indeed, undue influence in order to be effective "must amount to coercion or fraud". Annotation 92 A. L. R. 790. See also 43 C. J. S., Influence, p. 381; and *Pressley v. Kemp,* 16 S. C. 334, wherein the Court said "there must be proof that the act was obtained by this coercion—by importunity which could not be resisted.—"

We think there was testimony here requiring the submission of this issue to the jury; for *inter alia* we may refer, by way of repetition, to the testimony of the plaintiff herself, wherein she said that on the day after the death of her son the defendant Mr. Forsythe told her: "Mattie, now get up, and get yourself together, and let's get through with this, and get it over". This testimony was corroborated by Velma Mickens, a daughter of the plaintiff.

Attention should now be given to the terms of the release itself, and the same is set forth in full as follows:

"Columbia Dairies

South Carolina's Largest Producer-

Distributors of

Pasteurized Milk

Cream and Buttermilk

Ice Cream

917 Main Street                    Phones 3171 - 3172

Columbia, S. C.

June 10, 1946

I, Mattie Hair Gomillion, being the mother of: Willie Gomillion, Jr., (deceased) do hereby state that it is satisfactory and just, in the face of the existing facts, that the employer of the said Willie Gomillion, Jr., (deceased) will pay for all burial expenses, hospital and ambulance expenses, and any other expenses created by the necessity of carrying the

deceased to the hospital at the time of the accident that resulted in his death, and that I shall not, now or later, call upon or expect the said employer to pay any further sum of money to me in compensation, or otherwise, .as a result of the accident and death of the said Willie Gomillion, Jr., and do hereby release the said employer, Mr. J. L. Bell, being in turn employed by the Columbia Dairies, of any further claim on my part, as a result of the accident and death, herein mentioned.

· Signed: MATTIE H. GOMILLION (Mother)
$385.00 Undertaker
  25.00 to Mattie Hair

Witness: ANNA MAY MANIGAULT
Witness: W. H. PLOTT
State of South Carolina, County of Richland; ss
Sworn to and subscribed in my presence this 12th day of June, 1946

B. E. SMYRL

*Notary Public for South Carolina"*

As hereinbefore stated, this release was prepared by ██ Mr. Smyrl, the office manager of the defendants; and it will be observed that it is somewhat unusual in its terms, having been drawn by a layman, and was not under seal. However, the evidence shows that upon the execution thereof $385.00 was paid by Mr. Forsythe to the undertaker, which he says he paid in behalf of Mr. J. L. Bell. It is obvious of course that if the jury found that the plaintiff was entitled to recover on account of the death of her son, the amount of the funeral expenses alone would be manifestly inadequate damages. Indeed, normally funeral expenses do not constitute an item of damages in a Lord Campbell's Act case, such damages consisting mainly of mental shock and suffering, grief and sorrow, loss of companionship, deprivation of the use and comfort of the intestate's society, together with the pecuniary loss incident thereto. *Mishoe v. Atlantic Coast Line Railroad Co.,* 186

S. C. 402, 197 S. E. 97. In fact, as will appear by reference to 16 Am. Jur. 129, there is considerable conflict among the authorities in other States as to whether funeral expenses really constitute a proper element of damages in such a case. The law, however, is settled in this State that where such expenses are paid by the beneficiary they are a proper element of damages. *Petrie v. Columbia & G. Railroad Co.*, 29 S. C. 303, 7 S. E. 515. It may also be mentioned that ordinarily funeral expenses are not involved in a Lord Campbell's Act case, being usually payable out of the estate of the decedent.

Of course, every case involving a release depends on its own facts and circumstances, and hence some releases have been held valid, while others have been held invalid. Among the cases which might properly be considered as pertinent to some of the issues involved here is that of *Treadway v. Union Buffalo Mills Co.*, 84 S. C. 41, 65 S. E. 934, wherein it was held that evidence tending to show the poverty and necessitous condition of the releasor at the time of. the execution of the release is competent on the issue as to whether the release was fairly obtained. Another case of interest is that of *Medlin v. Vanderbilt*, 133 S. C. 256, 130 S. E. 893, wherein it was held that the validity of a release of liability for injuries, signed when claimant and his wife were in *dire straits,* was properly submitted to the jury.

If there was no fraud in connection with the release, using the term "fraud" in its comprehensive sense, then it is quite clear that the sum of $385.00 admittedly paid by Mr. Forsythe would be *sufficient* consideration; but where fraud is involved *inadequate* consideration, if such there be, may be considered by the jury. 17 Am. Jur. 907.

It follows from what has already been indicated that we are of opinion that the trial Judge was in error in directing a verdict upon the ground that the re-

lease was valid, whereas, he should have submitted this issue to the jury.

This brings us down to the second question involved herein, to wit:

*Question 2. Was J. L. Bell an independent contractor or an employee of the Columbia Dairies?*

The contract between Columbia Dairies and Mr. Bell was entirely oral, and the testimony does not give its terms in narrative form, nor are all the details disclosed by the evidence. The only testimony relating to the contract was given by J. L. Bell and S. B. Forsythe, one of the defendants.

We gather from parts of the testimony of these two witnesses that the Columbia Dairies, having six routes over which their product, milk, was sold and delivered to their customers, engaged Mr. Bell as a truck driver and delivery salesman on commission, assigning him a certain route which had been previously established, over which he was to deliver milk to the regular customers of the Columbia Dairies and other customers whom he might solicit, being responsible for their payment of the price of the milk sold and delivered. And Mr. Forsythe testified that if a customer on Mr. Bell's route inquired about a charge account, he was referred to Mr. Bell, because he was not required to serve a customer, unless he saw fit to do so, because of his responsibility for the payment for all milk sold and delivered by him. It further appears from the testimony of Mr. Bell that the milk was sold by him at the *uniform* price. Quoting from his testimony: "Q. Columbia Dairies told you what price to sell the milk for, didn't they? A. Yes, sir. Q. And you had to sell it at that price, didn't you? A. Unless I wanted to stand the loss myself."

Mr. Forsythe testified that he did not know the deceased, Willie Gomillion, but that he knew that boys were working for all of the truck drivers, and he stated positively that the defendants had nothing to do with the hiring or firing .

of these helpers. Mr. Bell's helpers at the time of the accident were two young colored boys, Willie Gomillion, the decedent, and his younger brother, Herbert Gomillion; and there was testimony to the effect that Mr. Bell himself paid his helpers; and that he also paid the Social Security costs of the decedent, that is to say, that the same were actually paid by the Columbia Dairies, but were charged to Mr. Bell. In fact, all of the records were kept by the Columbia Dairies.

Mr. Forsythe also testified that all the drivers pay for the uniforms used by the helpers. Quoting: "They are charged to the dairy, and we charge them to them". However, the insignia, if any, on these uniforms are not referred to in the testimony, and we have no information concerning the same.

We quote the following from the testimony of Mr. Bell: "Q. Now, Mr. Forsythe could have fired you at any time, couldn't he? A. Yes, sir." And Mr. Forsythe testified as follows: "Q. You could have fired Mr. Bell, couldn't you? A. Sure."

A very important part of Mr. Bell's work consisted in driving a milk motor truck owned by the Columbia Dairies and upon which their name was visibly inscribed. This truck was used by him in the transportation of the crates containing the bottles of milk, which were delivered from the truck, with the assistance of the helpers, to the customers buying the milk. It will be observed that the Columbia Dairies furnished the motor truck, including the gas and oil used therein; and moreover the motor truck was maintained by the Columbia Dairies. Mr. Bell testified that the Columbia Dairies furnished the gasoline and oil, and the servicing of the truck. And Mr. Forsythe testified that they furnished the truck, "and the gas and oil, and keep up the truck". He further testified that they had mechanics "that keep them (the trucks) in good shape".

What then is an independent contractor? This is becoming a well recognized and distinct field of the law, and there

are numerous decisions on the subject, and it is manifestly difficult, if not impossible, to prescribe a formula applicable to all the varying facts and circumstances, especially where the contract is oral as in this case; although, of course, an oral contract is entirely legal.

Factual variation with reference to the elements involved in the many cases coming before the Courts is so great that it may be said that practically each case depends upon its own peculiar circumstances, subject only to certain general principles. The following, however, seems to be a comprehensive and correct statement, which may properly serve as a guide with regard to the evidence before the Court in this case, the same being quoted from 56 C. J. S., Master and Servant, § 3 (1), p. 41 : "An independent contractor is one who, exercising an independent employment, contracts to do a piece of work according to his own methods, without being subject to the control of his employer except as to the result of his work; an independent contractor is not a servant, and there is no master and servant relation between his servants and the employer or contractee."

Some of the facts disclosed by the evidence indicate that Mr. Bell was an independent contractor, such as his relation to his helpers, whose compensation was paid by him, with the right to hire and fire; and his responsibility to the defendants for all the milk sold and delivered by him. On the other hand, however, there were certain other factors disclosed by the evidence from which a different conclusion might be drawn; and we refer particularly to two of them, one being the right of the Columbia Dairies to discharge Mr. Bell at any time. This is a factor frequently recognized as indicating that the relationship is not that of an independent contractor, but standing alone it is not always regarded as conclusive. In our own very recent case of *Norris v. Bryant,* S. C., 60 S. E. (2d) 844, 850, it was held in the well considered opinion delivered by Mr. Justice Oxner that it could be reasonably inferred that, through the power to terminate the contract, the contractee could control and direct

the means and manner of the performance of the work, and place the contractor "in a position of complete subservience"; but under the facts and circumstances of that case the Court ruled that the question was one for the jury.

The other factor to which particular reference is made relates to the agreement with regard to the motor truck. It is true that the mere fact that the contractor is furnished with certain machinery and equipment for the conduct of his work does not render him a mere servant or employee; but here not only was the motor truck furnished by Columbia Dairies for use by Mr. Bell, but it was also continuously provided with gasoline and oil necessary for its operation, and also Columbia Dairies were admittedly responsible for its continuous maintenance and upkeep, and thereby assumed liability for the maintenance of a safe place in which Mr. Bell and his helpers were to work. Such a definite control of the chief instrumentality used by Mr. Bell, bearing the name of the defendants and advertising their business, we think was a circumstance to be considered by the jury, along with all other evidence in the case, in determining the true intent and meaning of the contract between Columbia Dairies and Mr. Bell.

It should also be mentioned that there are at least two other circumstances contained in the evidence to be considered by the jury in connection with this question, one of them relating to the Social Security card of the decedent, which contains the following:

"—Willie Gomillion—
1401 Whaley Street
Columbia, S. C.
Worker's Name and Home Address Columbia Dairies
———— Columbia, S. C."

The trial Judge construed this as meaning that "Columbia Dairies" was a part of Willie Gomillion's address; but the quoted excerpt might be construed as first giving his name and address, and then stating the name and address of his

employers. We think therefore there is an ambiguity, and that it was for the jury to determine the true intent and meaning of the quoted excerpt. *Wheeler v. Globe & Rutgers Fire Ins. Co.,* 125 S. C. 320, 118 S. E. 609.

The other circumstance relates to the evidence of activities in behalf of the Columbia Dairies with reference to the procurement of the alleged release, including the stipulation therein contained that J. L. Bell was (quoting) "in turn employed by the Columbia Dairies", without qualification as to the nature of his employment. Mr. Smyrl, the draftsman, testified without objection, that he intended thereby to protect Columbia Dairies as well as Mr. Bell. And of course if the release is valid, it is effective as to Columbia Dairies, not only on the ground of estoppel, but upon the principle that the release of one joint tort-feasor releases all.

Judge Bellinger in ruling upon the relationship of Mr. Bell to the defendants referred to *McDowell v. Stilley Plywood Co.,* 210 S. C. 173, 41 S. E. (2d) 872, 874, as being in point, but, while this is an interesting and informative case, we do not think it supports the trial Judge's holding. The contract in that case was a *written one* referring to the employees, two Andersons, as the *independent contractor,* and setting out the terms of the contract in detail. In fact, that contract is a rather typical one creating an independent contractor relationship, because it involved the logging of timber owned by the Company by persons engaged in the particular business of logging, and the contractors were paid on the basis of so much per thousand feet for the logs delivered, and the work was under their control (or that of their successor) without any "superintendence" by the Plywood Company. Some of the equipment used in the logging operations was furnished by the Plywood Company, but "on a rental basis", which readily distinguishes that case from the instant case.

We shall not attempt to cite all the numerous cases which might be tangent to the question under consideration, as it would unduly lengthen this opinion, but we will make ref-

erence to two interesting cases from other States, especially because they are *milk cases*. One of these is the New York case of *Glielmi v. Netherland Dairy Co.*, 254 N. Y. 60, 171 N. E. 906, in which the opinion of the Court of Appeals was delivered by the distinguished Chief Judge Cardozo, subsequently one of the Associate Justices of the Supreme Court of the United States. The facts of this case are not precisely the same as those in the case at bar, but they are similar in many respects, and the reasoning of the Court is applicable to the case before us. This case was a workmen's compensation case in which the Court sustained the Industrial Board's finding that the milk delivery man and salesman was a servant within the compensation Act, and not an independent contractor. The facts of that case, briefly stated, were that under the contract of employment the salesman was to travel a prescribed route and was responsible for the payment by the customers for the milk and cream sold and delivered by him. As stated in the syllabus, he "was to travel prescribed route, to use allotted horse and wagon, to submit to supervision at pleasure of his employer, and to hold himself subject to discharge at will". (Reference to the horse and wagon really *dates* this case, which was decided June 3, 1930).

"Claimant, while driving a wagon in accordance with this contract, was thrown out and injured". The State Industrial Board held that he was a servant, and made an award in his favor, but the Appellate Division, 228 App. Div. 729, 238 N. Y. S. 838, took a different view. The Court of Appeals was of the opinion that the evidence sustained the award of the Industrial Board, emphasizing the fact that the Dairy Company had the right to discharge the salesman at any time; and we quote the following from the interesting opinion of the Court: "If he (the salesman) does anything at variance with the will of his employer, its policy or preference, he knows that his contract of employment may be ended overnight. He is bound hand and foot as long as he works

the route at all, his freedom an illusion, and his independence but a name."

The other milk case is even more nearly in point, to wit, the case of *Spears Dairy, Inc., v. Bohrer,* decided by the Court of Civil Appeals of Texas, 54 S. W. (2d) 872, 874. In fact, about the only distinguishing feature is that the assistant of the truck driver and salesman "was employed by him with the express consent of appellant" (Spears Dairy, Inc.), but the assistant was not driving the truck at the time of the accident. The decision of the Court was based upon all the circumstances, and it was held that the truck driver was not only responsible "as to the result of his work, that is, the selling of the milk, but also as to the manner by which the milk was sold". The case was brought to recover damages for the wrongful death of a boy who was struck and run over by the truck driver. The Texas Court held as a matter of law that the truck driver "was merely a servant for whose act appellant was responsible".

Our conclusion, as already clearly indicated, is that the trial Judge was in error in directing a verdict in favor of the defendants on the ground that J. L. Bell was an independent contractor, and that on the contrary, he should have held that this issue should be submitted to the jury for their determination, upon all the facts and circumstances contained in the evidence.

There is another pertinent matter, which was not raised in the Court below, and was not mentioned in the argument here, which we are of opinion would preclude the direction of a verdict for the defendants, even if it were determined that Mr. Bell was an independent contractor. For the evidence shows as already recited that the defendants contracted to maintain the motor truck and keep it in good condition. And, as stated in 27 Am. Jur. 511: "When such fact exists, a right of action accrues to a servant of the independent contractor, who is injured by failure of the employer to comply with the contract".

The statement just quoted is amply sustained by the Michigan case of *Johnson v. Spear*, 76 Mich. 139, 42 N. W. 1092, 15 Am. St. Rep. 298, wherein the pertinent facts and the holding of the Court are correctly stated in the syllabus as follows : ".Where the owner furnishes machinery to a contractor while work is being done upon his premises, and injury results through his fault in not keeping it in suitable and safe condition, he is liable to any servant of the contractor for an injury resulting to him from defects therein, and his liability arises out of his obligation to provide safe appliances for the contractor to use, and to keep his premises in safe condition, independent of any contract provision to. that effect."

Since the case must go back for a new trial we would have refrained from discussing the testimony, if we could have properly done so. But clearly it was imperative to make reference to some parts of the testimony, so that the reasons for our conclusions might appear. And it must be borne in mind that we are not here concerned with the weight of the evidence, or the credibility of the witnesses; and we have of course not attempted to recite the substance of all of the testimony, our inquiry being necessarily directed to those portions thereof which might be deemed favorable to the plaintiff. Nothing that we have said should be interpreted as indicating in any way our opinion as to the merits of the cause, for we have none.

The judgment of the Circuit Court is therefore reversed and the case remanded for a new trial.

Reversed and remanded.

BAKER, C. J., and STUKES, TAYLOR and OXNER, JJ., concur.