16648

ROGERS v. ATLANTIC COAST LINE R. CO. *ET AL.*
(71 S. E. (2d) 585)

*Messrs. Hagood, Rivers & Young,* of Charleston, *for Appellants,*

68

*Messrs. J. D. Parler,* of St. George, and *A. R. McGowan* and *Thos. P. Bussey,* of Charleston, *for Respondent,* 

July 11, 1952.

TAYLOR, Justice.

Respondent contends that on March 1, 1950, while employed as foreman by Wee-Car Lumber Co. at Parker's Ferry, S. C., he was engaged in overseeing the unloading of a carload of steel rails from one of appellant A. C. L. Railroad Company's low gondola cars which had been placed on a siding for this purpose at Parker's Ferry, S. C., and while standing on the end of such car to more readily facilitate the unloading operation, appellant, engaged in shifting other cars without notice to respondent and negligently, wilfully and wantonly caused the car on which he was standing to be struck by another resulting in respondent being thrown between the cars from which he received permanent injuries; that appellant J. B. Amerson was the conductor in charge of the train. The appellants set up a general denial and contributory negligence, recklessness, and wilfulness as their defenses. The matter was heard in the Court of Common Pleas for Charleston County, and both appellants made timely motions for nonsuits and directed verdicts and after the jury had found for the plaintiff in the sum of $26,000 actual damages, they moved for judgment *non obstante veredicto* and for a new trial on the minutes, all of which were refused.

Appellants now come to this Court contending: First, the respondent was guilty of contributory negligence which would bar him of recovery; second, that the evidence was not sufficient to warrant the submitting of the issues to the jury; third, that the verdict was excessive and the result of passion and prejudice.

The testimony shows that at approximately 4 o'clock on the date in question appellant Railroad's freight train with the appellant L. B. Amerson as conductor, arrived at Parker's Ferry, S. C., on its way to Charleston, S. C., from Savannah, Georgia. The train stopped near where respondent with a crew of workmen was engaged in unloading steel rails which were approximately some 30 to 35 feet long and weighing "1700 or 1800" pounds. Respondent Rogers asked

the conductor if the car containing the rails could be moved closer to the crossing in order to facilitate unloading. A portion of this testimony appears as follows:

"Q. And where were you with reference to the gondola at the time that the caboose stopped close to you? A. I jumped down off the end of the car, and walked back about the middle of the car, and I saw the conductor get on the ground off the caboose.

"Q. Then what, if anything, took place between you and the trainman? A. I asked the trainman could he move this car closer to the crossing for me.

"Q. Did you explain to him at all why you wanted that done? A. So I wouldn't have to back the truck so far in there to get to the car.

"Q. And what, if anything, did the trainman say to you? A. He said, 'No, sir, Cap, I can't move this car at all,' and he was walking all the time; he didn't stop.

"Q. In what direction was he walking? A. Towards his engine, the Charleston way.

"Q. Did you see that trainman again after the conversation? A. No sir, never did see him any more."

As a result of this conversation, respondent stated to the employees under his direction, "Boys, let's go back and go to work; he's not going to move the car." Some several rails had been removed from the car when it was struck from the Charleston end by another car as a result of shifting operations in the siding by appellants, causing him to fall between the two, and allegedly resulting in such injury to respondent as will be hereafter referred to in detail. Respondent further states that the first thing he knew after the cars had made contact was being warned to protect his legs from the wheels as the car was rolling and in his estimation did so for approximately the length of the car. He further stated that he had relied upon the conductor's statement that the car would not be moved; that he received no warning from anyone to the contrary and was not aware that shifting ope-

rations were being carried out on the siding until after the car on which he was standing had been struck.

Respondent further testified that in order to co-ordinate the efforts of the employees engaged in unloading the heavy rails, he was standing on the end of the car (which was approximately 2' 9" high from the floor with a flange 4⅞" wide at the top) ; that he gave orders to the employees which controlled their movements. A portion of this testimony appears as follows:

"Q. Now, tell us a little bit more in detail about how your crew handles rails, like that. A. Well, we divide the men in the car, some on one end and some on the other, so that one or the other can get up a rail, and the men on one end get up one end, and the men on the other end, they come up with theirs. Then they holler 'Hoist it high,' then when they come to the truck and get ready to put on the truck, then they holler 'Trow Way.'

"Q. Who does that hollering? A. Well, I did that. I didn't do the hollering to raise, but I did the hollering of the 'Trow Way.'

"Q. Who did the hollering about moving forward or back? A. I did.

"Q. Do or not the men working in a car like that, do they repeat the call, or do they just take the command from you, or just how do they do that? A. It's a man on the other end that repeats the word you say."

There is other testimony to the effect that the low gondola car which was being unloaded was the last car on the siding away from the switch and that there were other cars between this car and the place where the switching operations were in progress such as to render it impossible for respondent to see such operations; that the car next to this car was a pulpwood car and that it contacted the gondola car after being struck by other cars being switched by the engine, causing respondent to lose his footing and fall between the cars.

The appellants, however, presented testimony which is at considerable variance with the foregoing, some of which was to the effect that the car was moved only a short distance, · some a few inches, some that the car was not moved at all and some that the car was not touched. Others testified that the coupling to the pulpwood car was a "light" or an "ordinary" one and that they were not aware that anyone was injured until sometime later.

In passing upon a motion for a nonsuit, testimony and all inferences from it must be taken most strongly against the defendant and if there be any testimony tending to prove any one or more of the specifications of negligence, the motion should be refused. *Sturdyvin v. Atlantic & C. L. R. R. Co.,* 98 S. C. 125, 82 S. E. 275; *Montgomery v. National Convoy & Trucking Co.,* 186 S. C. 167, 195 S. E. 247; *Jones v. American Fidelity & Casualty Co.,* 210 S. C. 470, 43 S. E. (2d) 355; *Mullinax v. Great A. & P. Tea Co.,* S. C., 70 S. E. (2d) 911; *Hopkins v. Derst Baking Co.,* S. C., 71 S. E. (2d) 407.

Where there is uncertainty as to the existence of negligence or contributory negligence, the question is one of fact and not of law, whether the uncertainty arises from a conflict in the testimony or because fairminded men might honestly draw different conclusions from the undisputed facts. Ordinarily, the question of contributory negligence is a mixed question of law and fact and is for the jury, but, when the evidence admits of but one reasonable inference, the question becomes a matter of law for the court. Negligence being a mixed question of law and fact, it is the court's duty to define negligence, but it is the jury's province to draw the inferences from the facts. *Snipes v. Southern Ry. Co.,* 166 F. 1, 91 C. C. A. 593; *Augustine v. Christopoulo,* 196 S. C. 381, 13 S. E. (2d) 918; *Turbyfill v. Atlanta & C. Air Line Ry. Co.,* 83 S. C. 325, 65 S. E. 278; see also 14 South Carolina Digest 455, Negligence, Key Nos. 136(2) and 136(3).

There is no contention that there is error in the charge and we are convinced that it cannot be said that the evidence is susceptible of no other reasonable inference than that respondent was guilty of contributory negligence as a matter of law. The first question, therefore, must be resolved against appellant.

In discussing the first question we have pointed out that the evidence presented sharp issues of fact which under such circumstances must be submitted to the jury with proper instructions. We are of the opinion, therefore, that the second question also should be resolved against appellants' contention.

Appellants next contend that the verdict was the result of passion and prejudice and should be set aside as excessive.

Dr. Ackerman testified that on March 1, 1950, he found respondent suffering with great pain in the region of the back and chest and gave him a sedative; that he failed to respond satisfactorily to treatment and developed discoloration in the lumbar region, whereupon he referred him to Dr. Herring.

Dr. Herring, who first saw respondent on March 6, 1950 testified in part as follows:

"There was a two inch contusion over the upper part of the abdomen, which was discolored, blue, tender to all palpatation over the contusion. The right wrist was swollen, was painful, and all movement of the wrist, right wrist was limited. All movement of his back was extremely painful. There was definite tenderness over the lower portion of the back, the last three lumbar vertebrae, and the lumbo-sacral region. There was a blue discoloration over the region of the fourth and fifth lumbar vertebrae, due to a contusion in this region. The left perineal region, or region about the rectum, was red; it was hardened, indurated; it was extremely painful. An internal examination at that time could not be done because of severe pain.

"X-rays of his wrist did not reveal any evidence of fracture. X-ray of his spine did not reveal any fracture either.

"It was my impression at that time that he had a traumatic contusion of the upper abdomen, and the lower back. Sprain of the right wrist, Lumbo-sacral strain; and injury to the rectum, with abscess formation.

\* \* \*

"A. My opinion, from my examination and my treatment of the case, is that all came about as the result of a fall or injury, a fall producing an injury to his lower back, to his rectal region, and to his lower bowel, to his right arm.

"Q. Doctor, tell us whether or not you have prescribed all the treatment for this man that you knew of? A. Well, we have used all types of treatment except the possibility of physiotherapy by a trained person in giving that, massage, diathermy, and treatment of that sort. It hasn't been in any way convenient for him to get that kind of treatment, and he has apparently reached all the improvement that he will reach from the medical care that he has received.

"Q. Doctor, tell us whether or not, in your opinion, Mr. Rogers will get any better? A. Well, he has remained more or less stationary. His injury was a little over a year ago, I wouldn't expect any further improvement.

"Q. Doctor, tell us whether or not, in your opinion, this man is now physically able to perform labor such as he performed before the injury, going out on the job in all kinds of weather, and being an active worker? A. Well, I didn't consent for him to go back to work, because I didn't think he was able to perform the duties that required climbing and bending his back and using his arms, and that sort. I still don't think he's able to do that.

"Q. Tell us whether or not, Doctor, you think he will ever be able to perform those duties again. A. No, I don't think so. \* \* \*

"Q. Doctor, tell us whether or not the condition which you found, if you found any causes, such as illness or disease, that you could attribute the condition which you found Mr.

Rogers in, to? A. Well, I believe that a correct diagnosis in medicine always depends on the history given by the patient, along with the findings that you find on physical examination. The findings that I have enumerated and been through could have been due to an accident ,and, in my opinion, were due to an accident, as I find no other pre-existing disease to bring about such a condition. He had no evidence of—

"Q. It is your opinion it was due to an accident, as you found no pre-existing disease? A. Yes, sir.

"Q. Doctor, you spoke of Mr. Rogers being unable to control his bowel movements; tell whether or not, in your opinion an accident could cause that condition? A. Well, not just the simple accident couldn't cause it, but I think the story of this man, having had a rectal abscess, having had a rectal fistula, which opened inside the rectum, and to the outside, and the operation of cutting out that tract, although we expect them to heal and have normal bowel control, it is entirely possible that—and it quite often happens that they do not have normal bowel control, after any operation which cuts the rectal sphincter or rectal muscle. We don't expect that to happen, but it can happen.

"Q. That is, the bowel movements and all are controlled by a muscle? A. At the end of the rectum, at the opening to the outside, there is a circular muscle which keeps it closed, keeps the rectum closed, and when the bowel movement passs, that muscle opens up; closes down like a draw string; opens and closes the rectum. Once it has been cut, it's entirely —or it does happen at times that the control is not what it should be. I don't think that it means, in the case of this man, that he has no control. He can control his bowel movements, but when he has the urge to have a bowel movement, he has to go at once. He can't wait until a convenient time; put it that way. Has to have a movement immediately, or he will soil his clothes."

Dr. Herring further testified that respondent was admitted to the hospital in Charleston, S. C., where he underwent

surgery. Later, after respondent had left the hospital, he returned again for a period of five days. There is further testimony to the effect that respondent has been under constant care of a physician since May, 1950, and has suffered pain constantly. The testimony further shows that prior to respondent's injury, he was in excellent health and had worked in the navy yard operating a heavy crane; that after he left the hospital he returned to the navy yard as a crane operator, but operated what was described as a diesel crane which was lighter and more easily handled.

His foreman, Mr. Dickey, testified that prior to respondent's injury, he was a hard and conscientious worker, but that since, his condition had progressively deteriorated to such an extent that at the time of trial he was classified as physically handicapped and had been assigned the duty of answering the telephone.

Respondent's wife testified that prior to his injury he was in excellent health but his condition grows progressively worse since his injury; that he suffers pain almost constantly and that she applies hot and cold packs sometimes nightly and at other times every other night in her effort to afford him some relief.

Appellants introduced into the record respondent's work sheet at the navy yard which shows that his wages were $13.28 per day in May, 1950, in November, 1950, it was $14, and January 8, 1951, $14.16. It also showed that respondent was away from work on September 15 for three hours; September 25, eight hours; November 14, eight hours; November 30, seven hours; December 1, eight hours; December 4, eight hours; December 7, eight hours; December 11, eight hours; December 14, eight hours; December 27, eight hours; in 1951, January 11 and 29; February 28; March 5, 6, 7, 8, 9, 13, 16, 19, 20, 21, 22; that his gross earnings from May 26, 1950, until the end of the year were $2,150.52.

Appellants produced testimony from two eminent physicians, Dr. Frederick E. Kredel and Dr. A. J. Buist, Jr., both of whom testified that they had examined respondent's hospital record of 1950 and they found nothing therein to indicate back injury. In 1951, there were indications of arthritis of both hips, the cause of which was in nowise connected with trauma. Both physicians testified that in their opinion it was impossible for the fistula for which respondent underwent surgery to have been caused by an external blow. They stated that they found no record of muscular spasm which was an indication of pain, but did state that tenderness and limitation of back motion are "signs" of injuries and that discoloration was an indication of blood in the skin.

It will be observed that it is impossible to reconcile ■ the medical as well as some of the other testimony.

First, we have the testimony of two physicians who treated the respondent following the injury; second, we have the medical testimony of two other physicians who testified from the hospital records and their observations, and the two coincide in practically no respect which presents an issue of fact which must be passed upon by the jury.

"In personal injury actions the courts have for a ■ long time, in passing upon objections of excessiveness * * * of the damages allowed and in comparing present and past verdicts for similar injuries, given consideration to the increased cost of living and the impaired purchasing power of money. * * * As has been said, compensation means compensation in value. It will not do to say that the same amount of money affords the same compensation when money is cheap as when money is dear. The value of money lies not in what it is, but in what it will buy. A sum of money that was fair compensation in value for given injuries when money was dear and its purchasing power was great will not suffice when money is cheap and its purchasing power is small. Increased cost of

living or diminished purchasing power of money not only has been recognied as a proper matter for consideration of the court in passing upon a verdict attacked as excessive or inadequate, but has also been held to be a proper matter for the consideration of the jury in reaching a verdict in the first instance." 15 Am. Jur., Sec. 204, p. 621; *Jennings v. McCowan*, 215 S. C. 404, 55 S. E. (2d) 522, 531, and *Haselden v. Atlantic Coast Line R. Co.*, 53 S. E. (2d) 60, 214 S. C. 410.

In the recent case of *Richardson v. General Motors Acceptance Corp.*, S. C., 68 S. E. (2d) 874, 877, the most recent decision of this Court upon the excessiveness of a verdict, we find the following:

"The jurisdiction of this court to interfere with the amount of verdicts, including those for punitive damages, is quite limited and rarely exercised. *Bowers v. Charleston & W. C. Ry. Co.* (both opinions), 210 S. C. 367, 42 S. E. (2d) 705; *Dawson v. S. C. Power Co.* [220 S. C. 26], 66 S. E. (2d) 322. *Cook v. C. I. T. Corporation*, 191 S. C. 440, 4 S. E. (2d) 801, 125 A. L. R. 306, was a somewhat similar case to this and the verdict for actual and punitive damages, each, respectively, a little larger. It was rendered in 1938 and sustained on appeal in 1939 when it is well known and within common knowledge that the dollar was worth about twice its present value. This consideration has properly entered into former judgments of this court. *Bowers v. Charleston & W. C. Ry. Co., supra; Haselden v. Atlantic Coast Line R. Co.*, 214 S. C. 410, 53 S. E. (2d) 60 certiorari denied 338 U. S. 825, 70 S. Ct. 73, 94 L. Ed. 501; *Jennings v. McCowan*, 215 S. C. 404, 55 S. E. (2d) 522. It is but another evil of inflation. The subject is treated at length with respect to verdicts for personal injuries and wrongful death in an annotation in 12 A. L. R. (2d) 611. The concept was applied to punitive damages in *Bucktrot v. Partridge*, 130 Okl. 122, 265 P. 768, which were also included in *Jennings v. McCowan, supra.*"

For the foregoing reasons, we are of the opinion that all exceptions should be overruled and the judgment of the Court affirmed, and it is so ordered.

BAKER, C. J., and FISHBURNE, STUKES and OXNER, JJ., concur.