16847

GILLESPIE v. FORD *ET AL.*

(81 S. E. (2d) 44)

*Messrs. W. G. Acker,* and *John D. Vickery, Jr.,* of Pickens, and *W. Harper Welborn,* of Anderson, *for Appellant,*

*Messrs. Watkins & Watkins,* of Anderson, *for Respond-ent,*

March 19, 1954.

STUKES, Justice.

This action is for damages to plaintiff's automobile and for his loss of consortium by reason of personal injuries suffered by his wife in a collision between his automobile, which she was driving, and the defendant automobile which was operated by the personal defendant Ford. The insurance company was joined as a defendant upon allegations that Ford was its agent and servant and in the scope of his employment at the time of the collision, whereby it is liable under the doctrine of *respondeat superior*.

Trial of a companion action against the same defendants by plaintiff's wife for her damages for personal injuries resulted in verdict in her favor against all of the defendants. Upon appeal it was held that the only reasonable inference from the evidence adduced in the trial of that action was that the plaintiff was guilty of negligence, carelessness and recklessness which contributed as a proximate cause to her injury, whereby the verdict and judgment thereupon were set aside and the case remanded for entry of judgment in favor of the defendants. *Gillespie v. Ford,* 222 S. C. 46, 71 S. E. (2d) 596.

At the conclusion of the evidence offered for plaintiff at the trial of the present action the trial judge granted defendants' motion for order of nonsuit upon the ground that the case for the plaintiff could not be distinguished on the facts from the former, cited action. Plaintiff appealed and the defendant insurance company filed additional sustaining grounds for the order of nonsuit in its favor which are to the effect that plaintiff's evidence failed to establish that the agency of Ford included the operation of his automobile which he was driving, that Ford was an independent

contractor and not a servant of the company and, finally, that Ford was not acting within the scope of his agency or employment at the time of the accident.

After careful consideration of the evidence adduced in the first action, as stated in the opinion of this court upon the appeal of it, cited supra, and comparison of it with the evidence presented in the instant case, as contained in the record now before us, we are convinced that there are important differences which required the denial of the motion for nonsuit; and this conclusion is equally applicable, for the reasons hereinafter stated, to the primary appeal of the present appellant, which relates to the facts of the accident, and to the issues relating to the liability of the insurance company for the tort of Ford, its admitted agent, at the time and place of the collision. The evidence will be briefly stated in order to demonstrate the soundness of the view expressed.

The wife of appellant, who was driving his automobile alone, will be referred to as Mrs. Gilliespie. She testified that she was on her way from her Easley home to that of her mother in Belton and went by an unusual route because of construction in progress on the more direct and usual route. She knew the way she went on this occasion but not very well, having traveled it only once or twice before and then with her husband driving. She was cognizant of her approach to the intersection at which the collision occurred but thought that the road on which Ford approached to her left, which was paved only to the intersection, terminated at the paved road which she was traveling. She was driving at a speed of thirty miles per hour until she slowed for the intersection and put her foot on the brakes but, seeing nothing and thinking the road clear, she did not apply them; she looked first to the right at what she thought was a driveway from a house situate at the intersection, then she looked to her left and saw no vehicle approaching whereupon she started through the intersection, which was at a point about one hundred feet from

it; she thought that she could see about three hundred feet up the road on which Ford approached, but she never saw his car, looking ahead at the road before her when the vehicles collided. (She had to look three ways within a few seconds—see the patrolman's testimony, infra.) She was driving on the right of her road and denied the accuracy of her testimony at the trial of the other action that she was on the left of the road. She was cross-examined at length from the record of her former testimony and explained that she must have misunderstood some of the questions on cross-examination at that time because she always drove on the right of the road, and she said that at the time of the trial of the first action she was suffering from her injuries and was hearing poorly. (Her testimony in the former action was properly permitted to be used to contradict and discredit her, but that went to the credibility and was for the consideration of the jury; the court was bound upon the motion for nonsuit in the trial of this action to consider the testimony as then given; and so are we upon appeal.)

A disinterested witness who lived in the neighborhood, and had met the mailman at the intersection, testified that he saw the collision and observed both automobiles as they approached. He said that Mrs. Gillespie was on her right and Ford's car, quoting, "was going really fast." The latter applied his brakes and the car skidded sixteen or eighteen "good long steps" before the collision. Mrs. Gillespie's car, which he thought was traveling about thirty or thirty-five miles an hour, entered the intersection ahead of Ford and the front of it was practically through the intersection when struck; he further described Ford's speed as "plenty fast." This witness also testified to the distance from the intersection at which an automobile was visible on the respective roads, which was in agreement with the testimony of the highway patrolman to which we next refer. After the collision Ford, who seems not to have been seriously injured, asked this witness, quoting from the latter's testimony again,

"What to do, must he go to jail, must he call the law or what must he do * * *."

The patrolman testified that the scene of the collision, which he investigated, was three or four miles north of the town of Williamston. He found skid marks extending about fifty feet in the direction from which Ford came. The collision occurred about the middle of the road; Ford's car was damaged on the right front corner and Mrs. Gillespie's on the left, about the door. A car traveling sixty miles an hour covers eighty-eight feet per second and one traveling thirty miles, forty-four feet. There were no stop signs at the intersection. As Ford approached, Mrs. Gillespie was on his right, and he on her left as she approached. From her approach, a car on Ford's road was visible from a point about three hundred feet from the intersection; Ford could see the car from her approach when he was about two hundred and twenty-eight feet from the intersection. Ford's approach to the intersection was downgrade, while Mrs. Gillespie's was level.

The foregoing summary of the evidence concerning the circumstances of the collision is by no means complete but we think it is sufficient to show that it was error to grant the order of nonsuit. It is axiomatic that in considering such a motion the evidence, and all reasonable inferences therefrom, should be considered most favorably to the plaintiff. Ordinarily, it is the function of the jury to pass upon the issues of negligence, willfullness and wantonness and contributory negligence, willfullness and wantonness. Moreover, in this case the unusual ground upon which the nonsuit was granted makes the error clearer; contributory negligence is an affirmative defense and the defendant who pleads it has the burden of establishing it by the preponderance of the evidence. It rarely becomes a question of law for the court.

We should not unnecessarily comment upon the facts of the case as it will have to be tried again, but because of the division of the court it will be said

that under the evidence offered by the plaintiff, standing alone as it does now, the trial jury might reasonably find that Ford was guilty of recklessness, willfullness and wantonness to which the simple contributory negligence of Mrs. Gillespie, if found by the jury, would not constitute a defense to defendants' liability. There was direct and circumstantial evidence of excessive speed of Ford's automobile in approaching an intersection where the statute required him to drive more slowly. For a distance of two hundred and twenty-eight feet from the intersection he had a view of Mrs. Gillespie's car, if he was looking; and, on his right as they approached, she admittedly had the right-of-way. Of course, despite this, she was bound to exercise due care under the circumstances but whether she did or whether she was guilty of negligence and, if so, in what degree, if Ford was guilty of more than simple negligence, are all issues which should be submitted to the jury under proper instructions, as is the ever-present issue of proximate cause in such cases.

The foregoing rules are so well-established that authorities need hardly be cited to sustain them, but see generally the following recent decisions which are taken from appellant's brief: *Spearman v. Couch*, 218 S. C. 430, 63 S. E. (2d) 161; *Dawson v. South Carolina Power Co.*, 220 S. C. 26, 66 S. E. (2d) 322; *Hopkins v. Derst Baking Co.*, 221 S. C. 497, 71 S. E. (2d) 407; *Rogers v. Atlantic Coast Line R. Co.*, 222 S. C. 66, 71 S. E. (2d) 585.

The present action is similar to that of *Priester v. Southern R. Co.*, 151 S. C. 433, 149 S. E. 226, 227. There the plaintiff's wife lost her suit for damages for personal injuries in the Federal Court. The cited case was thereafter brought by her husband for damages for the loss of the services of his wife, etc., as here verdict was obtained and the judgment affirmed by this court which said: "The causes of action in the two cases are entirely different and distinct, and the judgment in favor of the defendants in an action on one is not a bar to an action

on the other. On this point the authorities are practically unanimous."

We now turn to the sustaining grounds of the respondent insurance company and shall first refer to the testimony of the manager of the branch office of the company in Williamston, who was called as a witness by appellant and whose testimony, in view of the nature of the appeal, should be stated and considered favorably to appellant.  ·

He had supervision of the ten agents of that branch office. When Ford was employed in February before the automobile accident in December he was assigned a debit territory, which included the place of the accident and extended about five miles north of Williamston. (We interpolate that this reasonably implied the necessity for the use of an automobile.) He was taken over the territory by the witness, who was his manager; his testimony thereabout follows: "Well, we made a list of the policyholders' names and addresses and we carried Ford around and introduced him to the policyholders, and, of course, informed them that he would be their agent to service the business there."

Ford and the other agents were required to visit the branch office in Williamston weekly on Thursdays and account for their premium collections, etc.; and Ford had also been there on the day of the accident, which was Monday. He was paid a commission of fifteen per cent on his premium collections and additionally for increased business, from all of which he earned about $50.00 per week. Receipt book was furnished by the company and he issued receipts from the book in return for premium payments. All of the agents have automobiles and the witness understood that Ford used his part of the time for the collection of premiums, and walked occasionally. Sometimes another representative of the company would go with Ford in order to help him get business, upon which Ford would receive the commission. With reference to new business, an agent may only accept an application for insurance which is transmitted to

the company. Social Security taxes were taken from Ford's earnings. Ford had, and could have, no other job and could not delegate his duties to the company to anyone else; he had to personally make the premium collections, but a substitute was provided for him for vacations. Ford's duties were described by the witness as, quoting, "to collect premiums from policyholders and solicit new business." He turned the premium collections into the branch office. The employment could be terminated by Ford or the company on one day's notice. Ford never refused to collect premiums on policies in his territory or debit. Occasionally the witness accompanied Ford on his route or debit. The witness was paid a salary and also commissions on any business which he personally produced. Ford is no longer employed by the company. The company did not prescribe working hours for the agents and it is unimportant whether an agent makes all of his collections in one day or in six days of the week; and the company did not direct the agent where he should go or when. (The latter statement of the witness must be considered in connection with the assignment of Ford by the company to a definite territory or debit.) The witness talked to Ford after the accident and then went to the scene.

From the foregoing, which is derived from the questions and answers in the record, the highlights of the company manager's testimony may be fairly re-stated for emphasis as follows: Ford was a collecting agent with allotted town and rural territory, which included the scene of the accident, and at such distance from Williamston that it may be reasonably inferred that an automobile was necessary; Ford was in the agency office that morning; he collected weekly from most of the policyholders for which purpose he used a receipt book furnished by the company. It was understood by the manager that part of the time Ford used his automobile and none of the ten agents in this branch was without one for use in the business; social security taxes were deducted from Ford's earnings; he was not allowed to delegate the performance of his duties to anyone else; was re-

quired to report at the branch office once a week; was subject to discharge from the employment on a day's notice; when he was absent from duty a substitute was provided to make the collections; the branch manager went to the scene of the accident when he heard about it. When Ford was first employed he was furnished with a list of the policyholders in his debit territory and was taken around and introduced to the policyholders by the branch manager who informed them that he (Ford) would be their agent to service their business.

The employment contract between the company and Ford was in evidence. It limited the agent to the territory assigned by his Branch Office which might be changed from time to time by the company. The agent was required to immediately remit all collections for the company and to keep a complete account; all books, records, etc., should be the property of the company, subject to examination by it, and surrendered to the company upon termination of the contract; the accounts kept by the company, of which it is not required to give copies to the agent, shall be conclusive evidence of the state of the accounts; the agent shall receive money for the company only in exchange for its printed receipts. Section 7 of the contract is here quoted:

"7. Nothing contained herein shall be construed to create the relation of employer and employee between the Company and the Agent. Within the territory above described the Agent shall be free to exercise his own judgment as to the persons from whom he will solicit business and the time and place of solicitation, but the Company may from time to time prescribe rules and regulations respecting the conduct of business covered hereby, not interfering with such freedom and action of the Agent, which rules and regulations shall be observed and conformed to by the Agent."

(The contract declaration against an employee relationship is unavailing in view of the other provisions of the contract. See *McNeill v. Electric Storage Bat-*

*tery Co.,* 109 S. C. 326, 96 S. E. 134, 135, where it was said: "It is true the contract provided that the relation of principal and agent should not exist, but when the provisions of a contract make a contract of agency then it is a contract of agency, and it makes no difference by what names the parties may call themselves." Indeed, the parties to the contract "doth' protest too much.")

The contract provided that it might be terminated by either party by giving the other one day's notice and thereupon the authority of the agent to collect premiums shall cease, and no commission shall be thereafter payable to him.

A witness was produced by appellant who lived on the Pelzer road, near the place of the collision. Ford had just been to her house and collected a premium on a policy of the company, which was his custom every Monday morning, and gave her the usual company receipt from his receipt book. When he left, he turned to the right and went toward the intersection where the collision occurred, which was three-fourths of a mile distant. He usually turned back toward Pelzer but this time he turned right.

We think that the evidence which has been stated at least gives rise to a reasonable inference that Ford was a servant of the company at the time of the accident, for whose tort it is liable, if committed in the scope of his employment; and the evidence likewise warrants reasonable inference of the latter. He appears to have been principally a collector, here on his rounds, and nearer in status a messenger than an independent contractor.

In *Norris v. Bryant,* 217 S. C. 389, 403, 60 S. E. (2d) 844, it was held that the plaintiff having made out a *prima facie* case of master-servant, the burden shifts to the defendant to prove the claimed independent contractor relation. Clearly there was here made out a strong case of such control of Ford by the company as to negative an independent contractor relationship. He was expressly required to collect premiums by personal calls on policyholders

and impliedly by use of his automobile, although he received no expense allowance or other remuneration for the latter except such as may have been considered to have been included in the commissions which he was paid on the collections. *Cf. Gulf Life Ins. Co. v. McDaniel, infra,* 75 Ga. App. 549, 43 S. E. (2d) 784, where there was an allowance of $2.50 per week for the agent's use of his automobile, to which the court gave no weight one way or the other, probably because of the insignificance of the amount.

While the liability of an industrial insurance company for torts upon the roads and streets which are committed by their premium-collecting agents, when about the performance of their duties, has not been heretofore directly decided by this court, there are two recent decisions which clearly point the way to liability. They are *Stevens v. Moore,* 211 S. C. 498, 46 S. E. (2d) 73, 78, and *Carter's Dependents v. Palmetto State Life Ins. Co.,* 209 S. C. 67, 38 S. E. (2d) 905.

In the first cited, Moore was a track supervisor of a railroad company. He was furnished a railroad handcar for transportation in the performance of his duties, but he sometimes used his personal automobile, which he was doing when he collided with plaintiff's motorcycle. There was evidence that he was in the performance of his duties, which issue was submitted to the jury and their verdict for plaintiff was sustained. The following quoted paragraphs are from the opinion:

"*Wilson v. [South Carolina] Power Co.,* 166 S. C. 469, 165 S. E. 186, 188, is controlling to the contrary of appellant's position that Moore's ownership of the automobile absolves the master of liability for its tortious operation, in view of the testimony that appellant furnished him a hand-car for his transportation about the master's business. But it is uncontradicted that he at least occasionally used his automobile in the company's business, as he undisputedly did on the day of the accident. In the cited case of Wilson the defendant's employee, whose duties were somewhat similar

to Moore's here, used his own car in going about his work but the master contended that it was a certain, agreed one upon which the master might carry insurance against liability for negligent operation. In driving another car of his own in the master's work the employee injured the plaintiff and the court overruled the contention that is now made in the instant case and tersely said: 'The instrument with which the alleged injury to the plaintiff was inflicted, if it was inflicted, is not in our opinion, material, and we cannot agree with the trial judge in his holding, in effect, that the defendant should not be held in damages because the said agent and employee happened to be using his Chevrolet automobile * * *.' It is thus seen that ownership of the instrumentality is unimportant. The vital query is its use at the time. This accords with the general rule in other jurisdictions. See the Annotation in 140 A. L. R. 1150 and the earlier A. L. R. Annotations there cited.

* * *

"Automobiles have added immensely to the ubiquity of agents and servants. The courts cannot close their eyes to this fact and to the commonplace practice of employees going from job to job in automobiles, sometimes owned by them and sometimes by their employers. The ownership of the offending vehicle in a case like that in hand makes no difference to an injured plaintiff and it should not with respect to the responsibility of the employer, whether he owns the vehicle or it is the property of the tort-feasor employee, if the latter's use of it in the performance of the duties of his employment is with the knowledge, express or implied, of the employer. In the instant case Moore was a sort of roving employee and it is easily inferable from the evidence, as has been said, that his use of his automobile in the performance of his duties was known to the superintendent and other representatives of the employer."

The *Carter case, supra,* involved the question of whether an agent of an industrial life insurance company was an employee within the terms of the workmen's compensation

act, or an independent contractor which was the contention of the company, as it is here with respect to Ford's means of transportation. It was concluded that the agent was an employee. The reasoning and authorities which were employed by the court to reach the conclusion are likewise applicable to the instant case; there is no substantial ground of distinction, as careful reading of the decision will show.

Another case, similar to the last cited, which originated in this State and concerned the agents of an industrial life insurance company is *Capital Life & Health Ins. Co. v. Bowers,* 4 Cir., 1951, 186 F. (2d) 943. The court held that the company's commission agents were for social security tax purposes employees rather than independent contractors, as claimed by the company, and that it was obvious that the seeming freedom from control of the agents was lacking in reality. Distinction was made between agents for the collecting of industrial insurance premiums, such as Ford in this case, and ordinary life insurance agents or solicitors. The facts of the latter distinction are well known; socalled industrial insurance is maintained by the personal solicitation and collection of weekly, or such, premiums of small amounts. The evidence in the instant case is that the premiums on the policies which Ford "serviced". were personally collected by him at weekly intervals and turned in by him on fixed schedule to the Williamston Branch Office out of which he worked.

The courts of other jurisdictions differ upon the question at issue but it appears that the later and better-reasoned decisions uphold liability in such cases. Among them are *Gulf Life Ins. Co. v. McDaniel,* Ga. 1947, 43 S. E. (2d) 784, affirming 203 Ga. 95, 45 S. E. (2d) 64; *Pinnix v. Griffin,* 1941, 219 N. C. 35, 12 S. E. (2d) 667; *Chatelain v. Thackeray,* 98 Utah 525, 100 P. (2d) 191; *Hall v. Sera,* 112 Conn. 291, 152 A. 148; *Cooke v. Drigant,* 1942, 289 N. Y. 313, 45 N. E. (2d) 815; *National Life & Accident Ins. Co. v. Morrison,* 1942, 179 Tenn. 29, 162 S. W. (2d) 501; *Miller v. Metropolitan Life Ins. Co.,* 134 Ohio St.

289, 16 N. E. (2d) 447; and *Lewis v. Constitution Life Ins. Co.,* 1950, 96 Cal. App. (2d) 191, 215 P. (2d) 55. It would unduly prolong this opinion to separately review these cases. They involved facts similar to those presented by the evidence in the instant case, some of them not as strong for plaintiff as this, and all held that the issue of the liability of the industrial insurance company-defendants for the traffic torts of their collecting agents should be submitted to the jury.

Applicable generally, and not to industrial insurance companies alone, is the following from 5 Am. Jur. 728, Automobiles, Sec. 393:

"The mere fact that an employee uses his own automobile in the business of the employer does not make the latter liable under the doctrine of respondeat superior for injuries inflicted by such employee in the operation of the automobile. If, however, the other circumstances involved in the case are consistent with, or require, the inference that the activity in which the servant was engaged at the time of the tort complained of, and in which he was using his own car or one which he had hired, was within the scope of his employment, the person injured may recover from the employer, if the servant's use of the automobile or other vehicle was authorized, either expressly or impliedly."

From the following text from 60 C. J. S., Motor Vehicles, § 453, page 1159, some of the above insurance cases are cited in the footnotes, as is our case of *Stevens v. Moore, supra:*

"The mere fact that the employee uses his own motor vehicle does not relieve the employer from liability for the employee's negligence in driving the vehicle, and where, with the express or implied assent of the employer, an employee uses a vehicle which the employee owns in the discharge of his duties, the employer will be liable for an injury occasioned by its negligent operation by the employee while acting within the scope of his employment."

*Dunne v. Contenti,* 256 App. Div. 833, 9 N. Y. S. (2d) 248, and *American Nat. Ins. Co. v. Poole,* 24 Tenn. App. 596, 148 S. W. (2d) 14, which have been cited as contra to our view, appear not to be now followed in their own respective jurisdictions. In the subsequent case of *Cooke v. Drigant, supra,* 1942, 289 N. Y. 313, 45 N. E. (2d) 815, the New York Court of Appeals sustained the finding of the jury that Drigant, under circumstances parallel to the case in hand, was an employee of his insurance company, rather than an independent contractor. No reference was made in this decision of the highest court of New York to the earlier *Contenti case* which was decided three years before by the inferior Appellate Division of the Supreme Court. Likewise the Supreme Court of Tennessee in 1942 decided *National Life and Accident Ins. Co. v. Morrison, supra,* 162 S. W. (2d) 501, 508, in which the earlier Poole decision of the intermediate Court of Appeals was referred to and not followed. Instead, effort was made to distinguish it and verdict for plaintiff was affirmed. The holding of the Supreme Court was recapitulated at the conclusion of its opinion, as follows: "Summarizing what has been said, we are constrained to hold (1) that Darby was an agent of the Insurance Company, (2) that he was at the time of this accident acting within the scope of his authority on the business of his principal, or master; and (3) that he was using the automobile, the instrumentality involved in the commission of the tort, by the authority, express or implied, of his principal, and that the Insurance Company was therefore, liable for the damages resulting from this tort."

*Gulf Life Ins. Co. v. McDaniel, supra,* in which the opinion is well-reasoned and replete with authorities from its own and other jurisdictions, is the subject of a note in Wyoming Law Journal, May 1948, page 130. It is there pointed out that the court concluded that the jury were justified in finding a verdict against the insurance company upon evidence that the agent was a servant of the company when he was performing duties in connection with his debit of in-

dustrial policies, although he may have been an independent contractor with respect to the solicitation of life insurance policies in other territory. The writer concludes, after citation in the footnotes of many decisions, as follows: "It is generally agreed that it is a question for the jury whether the employee was a servant or independent contractor at the time of the wrongdoing if there is sufficient evidence to support either finding. Where employment appears, the burden is on the employer to establish an independent contractor relationship. Control again is the determinant factor. The right of discharge is a circumstance of much importance."

Heavily relied upon in the brief of the respondent company is *Wesolowski v. John Hancock Mut. Life Ins. Co.,* 308 Pa. 117, 162 A. 166, 87 A. L. R. 783. However, the facts there were quite different. The area of the debit of the agent was less than a square mile in the City of Philadelphia, which he might well have walked to make his collections. The court said that the company was in no position to require the agent to use his automobile and such was no part of his contract of service. (Here the use by the agent of his automobile was clearly impliedly required; he could not reasonably be expected to otherwise cover the extensive territory of his debit and his use of his car was known to the company.) The court further said that the test of the master's responsibility is authority to control the servant's use of the instrumentality with which the injury was inflicted.

> In the case in hand it cannot be reasonably doubted that the company may have, under its plenary control of Ford with the right to subject him to rules and regulations, required him to observe rules of highway safety, such as to drive, when about the company's business, not in excess of a fixed rate of speed, to stop or slow at road intersections, etc., etc. The Connecticut court said in *Hall v. Sera, supra* [112 Conn. 291, 152 A. 150], which was a case such as this, in which liability of the employer

was upheld: "The important question, however, is not whether the company had physical control of the movements of the car at the time of the collision, but rather whether it had the right of general control over the driver himself—a question of status." The test is not as to the actual control exercised by the employer or master in such cases, but the right to control, of which there was ample evidence in this case.

The *Wesolowski case, supra,* is critically reviewed in a note in Georgetown Law Journal, May 1937, pages 914 *et seq.* It is there concluded concerning the decision, as follows: "The court did not decide in this case that Adams was not an agent and servant of the insurance company. It merely decided that, as to the operation of the automobile, the insurance company did not have sufficient direction and control so as to render it liable under the respondeat superior doctrine. Had the court been of the opinion that the solicitor was an independent contractor it would not have been called upon to decide whether or not the company had such control. Inferentially, therefore, at least, the court decided that non-liability on the part of the principal for torts does not preclude the solicitor from being an agent and servant."

The Georgetown Law Journal article just cited, which begins at page 894, is by a distinguished author and former law teacher who states at the outset of his article that the purpose of it is to determine whether insurance solicitors are employees or independent contractors. His conclusion, at page 929, is that such solicitors who devote all their working time to that pursuit and solicit for only one company are agents and not independent contractors, and most, if not all, belong to that class of agents who are also servants. The following is from page 912: "As to the two classes of life insurance solicitors herein considered, namely, solicitors of ordinary insurance and solicitors of industrial insurance, there is a small group of rather recent, well considered personal injury and workmen's compensation cases, some of which hold expressly that an insurance solicitor is not an

independent contractor, some of which on cursory examination may seem to indicate a contrary conclusion but actually do not, and only one of which indicates an independent contractor relation."

The exception is sustained, the order of nonsuit reversed, and the case remanded for new trial.

OXNER, J., and GRENEKER, Acting Associate Justice, concur.

BAKER, C. J., and TAYLOR, J., dissent.

TAYLOR, Justice (dissenting).

I regret that I am unable to agree entirely with the holdings in the majority Opinion.

Action in this case was brought in the Court of Common Pleas for Anderson County for property damage and loss of consortium suffered by Appellant when a car driven by his wife was in collision with Respondent car driven by Respondent, Dewey A. Ford. The Respondent, Liberty Life Insurance Company, was made a party upon the theory that Respondent Ford was its agent or servant and at the time of the collision was acting as such.

The answers set up a general denial and contributory negligence with the answer of the Defendants Ford and the car which he was driving pleading negligence, willfulness, wantoness and recklessness on the part of Mrs. Gillespie as the sole cause of the injury.

The case came on for trial at the October, 1952, term of Court. A motion for a nonsuit was duly made on behalf of all Defendants (Respondents) which was granted and Appellant comes to this Court contending that there was sufficient evidence to require the case being submitted to the jury for its consideration.

This is a companion case to that of *Gillespie v. Ford*, reported in 222 S. C. 46, 71 S. E. (2d) 596, which was brought by Mrs. Gillespie, wife of Appellant here, for damages sustained in the same collision. This Court in that

case went into the testimony in great detail and since the witnesses are the same and the testimony very similar, I will discuss here only that evidence which I conceive as differing in an important aspect from that of the previous trial.

Mrs. Gillespie testified in the first case that she was traveling on the left-hand side of the highway, where she had no right to be, Sections 67 and 72 of Article VII, Act 281 of the 1949 Acts, at the time of the collision while in this case she testified that she was traveling on the right-hand side which relieves her of the burden of overcoming the presumption that such proximately caused the injury, *Tinsley v. Parris,* 174 S. C. 412, 178 S. E. 496.

The right front fender, headlight and wheel of the Ford car suffered the brunt of the blow with the right rear fender being damaged to a lesser degree. The point of impact on the Gillespie car was on the left side near the door hinges. The impact of the blow turned the Gillespie car around to the extent that it was practically heading back in the direction from which it had come. There is some testimony that the Ford car was traveling faster than that of Mrs. Gillespie and that she had entered the intersection from Ford's right and had proceeded to the point that the front part of her car was virtually through the intersection at the time of the collision. The testimony does not as a whole differ greatly from that of the case heretofore referred to, the most important one being as to the position of the Gillespie car, whether on the right or left of the road at the time of collision. This could be an important factor when considered in the light of the presumption which attaches if she was on the left and whether or not the additional distance that Ford would have traveled across the intersection before colliding with Mrs. Gillespie's car would have been sufficient for him to have avoided the car altogether if she was on the right as there is evidence that he was attempting to do so by turning sharply to his left at the time and succeeded to the extent that only his right front fender, wheel and light were

damaged to any extent. Although the testimony produced is so similar to that produced in the trial of Mrs. Gillespie's case, *supra,* that the trial Judge was induced to grant a nonsuit, I am of the opinion that when the foregoing is taken into consideration along with the other circumstances, there is sufficient evidence to require the submission of the case to the jury as the question of contributory negligence is usually one of mixed law and fact and unless it admits of but one reasonable inference, in which event it becomes a matter of law for determination by the Court, it should be submitted to the jury. *Bolen v. Strange,* 192 S. C. 284, 6 S. E. (2d) 466.

The Respondent life insurance company duly moved for a nonsuit upon the grounds: First, that the agency of Ford did not include the operation of his car; Second, that Ford's status with the Company was that of an independent contractor; Third, that there was no evidence that Ford was acting within the scope of his employment at the time. This motion was not passed upon by the trial Judge as he based the granting of the nonsuit upon the ground heretofore discussed. We are therefore confronted with the vital question of whether or not Respondent Ford was the agent or servant of the Liberty Life Insurance Company and acting within the scope of such at the time of the collision or an independent contractor.

The Respondent Dewey A. Ford, a licensed insurance agent, entered into a written contract with Liberty Life Insurance Company, dated April 24, 1950, under which he was assigned a certain territory in Anderson County where this Company had certain industrial policyholders from whom weekly premiums were collected, thus constituting what is called in the field of industrial insurance a *debit.* And pursuant to this contract Mr. Ford's duties were to "service" the policyholders, collect the premiums maturing from time to time, and to write new business. His compensation was based strictly on a commission basis; and the testimony

shows that he averaged in the neighborhood of $50.00 a week.

There is nothing said in the written contract whatsoever with regard to Mr. Ford's means of transportation, although in order to perform his duties some such means would be required. Manifestly, however, the reason nothing is said about this is that the Company was not concerned with it, that being a matter for which the agent was solely responsible. In other words, he was to provide his own means of transportation, *without any allowance by way of expense or otherwise on the part of the Company.* So far as transportation was concerned his relation to the Company was that of an independent contractor; that is to say, he was not subject to the control of his employer, in this particular respect, as to the *means* by which the result is to be accomplished, but only as to the *result* of the work. It is of course well settled that an employee may be an independent contractor as to certain work, and yet be a mere servant as to other work for the same employer. *Googe v. Speaks,* 194 S. C. 206, 9 S. E. (2d) 439.

There is no substantial conflict in the testimony on this phase of the case. We are reproducing herewith excerpts from the testimony of J. L. Metz, Manager of the Williamston local branch office of the Liberty Life Insurance Company:

"Q. What was his average weekly earnings and how were they arrived at? A. Well, his earnings consisted of a commission and I would say it was approximately $50.00 a week.

\* \* \*

Q. At the time you employed him did he have an automobile? A. I believe he did, yes, sir.

Q. Was he using his automobile in the course of his employment at the time of this accident? A. I understood that part of the time he did and part of the time he didn't.

Q. Do you mean by that he walked occasionally to collect premiums? A. Yes, sir.

Q. Would you have employed him if he had not had an automobile, or was it practical for him to handle this job without an automobile? A. Well, it could have been done.

Q. It could have been? A. Yes, sir.

Q. Do you have any agent working out of your office that doesn't have an automobile? A. No, I don't believe I do.

\* \* \*

Q. Now, who makes the general rules of conduct for the agent, as to duties and so on and so forth? A. For his daily activities?

Q. Yes, sir. A. Well, so far as his daily activities are concerned it is entirely up to him to handle his debit, whatever way is most profitable to him. We have no prescribed rule for that.

\* \* \*

Q. Now, how about terminating his employment, do you have any rules along that line? A. No, that is left entirely up to him and the company. That can be terminated in one day's notice.

\* \* \*

Q. Now, what about the vacation, special trips and so on, was it the duty of the agent or not if he planned to take a trip or vacation and leave his debit? A. Ordinarily it is to his advantage, because if he was to take off of duty there would be no one to serve his business and he would lose his collection commission, and by notifying us we have a man to make his collections for him and he receives his commission just as if he had collected himself.

Q. A moment ago I believe you stated that you could, under the agreement you have, or Mr. Ford has, with your company, your company could terminate his employment upon a day's notice? A. Yes, sir.

\* \* \*

Q. What if anything did the Company prescribe as to when he would collect from a particular policy-holder? A. Nothing.

Q. What if anything did the Company prescribe about what route he would follow, whether he would go from this house to that one or some other way around? A. We leave that entirely, Mr. Watkins, to the Agent to set up his own collection schedule, his own working hours, that is most convenient to him and the policy-holders.

\* \* \*

Q. What does the Company prescribe about working hours for the Agents? A. We don't have any certain hours for the men to work.

Q. You don't have a time-clock? A. No, sir, we don't punch a time-clock.

Q. Is it of any importance to the Liberty Life Insurance Company whether the Agent makes all of his collections in one day or over the six days a week? A. It doesn't make a particle of difference with them.

Q. Mr. Metz, did you have any knowledge at the time of this accident, about where Dewey Ford was on that date? A. No, sir.

Q. Did you know who he was planning to see that day? A. No, sir.

Q. You were not with him, of course, on this day? A. No, sir.

Q. Had you or anyone connected with the Liberty Life Insurance Company directed him to be where he was on that day? A. No, sir.

Q. Mr. Metz, what control, if any, did you or anyone with Liberty Life Insurance Company exercise over the physical movement of the agent, where he should go and when? A. None.

Q. Do you know how and why Dewey Ford happened to be at this place at the time of the accident—do you have any knowledge of why he was there? A. No, I don't.

Q. Do you know his purpose for being there? A. No, sir.

Q. You don't know whether he was there going to see a policy-holder or for some entirely different reason, do you? A. No, sir.

Q. Mr. Metz, does an agent have to account to you or anybody connected with Liberty Life Insurance Company the time they spend on a debit? A. No, sir.

Q. Do they make any report of hours worked? A. No, sir.

\* \* \*

Q. I believe you stated that Dewey Ford had a license issued by the South Carolina Insurance Commissioner to sell life insurance? A. That's right.

Q. Now, who pays the cost of that? A. The agent pays that cost himself."

The means of transportation of an industrial insurance agent, we may assume, would depend upon the location and extent of the territory covered by his debit. Indeed, it would appear that in a large town or city the area might be so compact that the agent could walk in the collection of premiums and the like; or sometimes in the case of a city he might be able to use the public bus system, at least to some extent. However, where the territory is out in the country and covers a considerable area, under modern conditions, an automobile or perhaps a motorcycle would be the only practicable way. But this does not mean that he must own his car, for of course he might hire one; and then too, he might employ someone to drive the car in which he was riding.

It will be observed from the foregoing excerpts from the testimony of the local Manager, Mr. Metz, that he was without authority from the Company to require Mr. Ford to have an automobile of his own and that the Company had no control, or right of control, of the operation of Mr. Ford's automobile.

There is no evidence whatever that Dewey A. Ford at the time of the accident was operating his car under the direction or control of Liberty Life Insurance Company. Indeed, the evidence is conclusive to the contrary. In other words, the Company did not direct or control the operation of Mr. Ford's car in any manner whatsoever at the time of the accident or at other times. In fact, liability is determined by

the relation that exists "at the time and in respect to the very transaction out of which the injury arose." *Holder v. Haynes,* 193 S. C. 176, 7 S. E. (2d) 833, 838.

There are numerous authorities to be found in the reports from other States which are relevant to the primary issue under discussion, namely, as to whether .the agent of an insurance company, or some other like employer, may be deemed a servant or an independent contractor under circumstances akin to those involved in the case at bar. These decisions are not uniform in their holding, and much of their variation is due to the varying facts of the particular case. But with due allowance for this, it is true that there are apparently two schools of judicial thought, one holding that the doctrine of *respondeat superior* should be extended to hold the company or other employer liable, while it seems to me that the other cases holding that the relation is that of an independent contractor, are much more logical and sound in their reasoning. I am unable to say where the numerical weight of authority lies, but certainly there are many cases from courts of distinction denying liability on the part of an insurance company or other like employer, such conclusion having a firm basis in reason and common sense, and hence not contrary to public policy.

There are two South Carolina cases which in general are akin to the subject under discussion, although clearly not in point, and not cited in any of the briefs, wherein it was held that the employer was liable because of the existence of certain important factors *completely absent in the case at bar.* The first one of these cases is *Wilson v. South Carolina Power Co.,* 166 S. C. 469, 165 S. E. 186, 187. The employee in this case was employed by the defendant company as its agent to keep its lights in repair, and in doing so to travel from one place to another, and "to use a Studebaker car for the use of which they were to pay him $50.00 per month." This action arose out of an automobile collision, and at that time the employee was using another car which he owned, to wit, a Chevrolet; and the Court held that this

fact was quite immaterial, and that the company was liable. But the company specifically hired the employee to use his own car at the rate of $50.00 per month, a circumstance which completely differentiates that case from the case at bar.

Likewise in the case of *Stevens v. Moore*, 211 S. C. 498, 46 S. E. (2d) 73, 76, the employee was the track supervisor with supervision and maintenance of a portion of the track of the defendant Southern Railway-Carolina Division, and Moore, the employee, was instructed to use "the hand-car, which he described as a small motor car, for transportation in his work and that he was never instructed to use his automobile". Notwithstanding this, however, it appeared that Moore did use his automobile, with the express or implied knowledge of the Company, and that it was therefore liable in the collision which occurred between Moore's automobile and the motorcycle of the Plaintiff. But it will be observed that the Company was directly *concerned with Moore's transportation* in connection with his work, and although he had used another method, there was evidence from which the jury was justified in finding that the Company had acquiesced in and sanctioned Moore's use of his own automobile, instead of using the hand-car which had been furnished him.

There is another South Carolina case, mentioned in one of the briefs, involving an automobile accident, to which reference will be made because it is an illustration of a case which is definitely *inapposite* to the case at bar. The case referred to is *Gomillion v. Forsythe*, 218 S. C. 211, 62 S. E. (2d) 297; wherein it was held by this Court that the evidence presented a question for the jury as to whether a truck driver delivering milk for a dairy company on a commission basis was an independent contractor or an employee in connection with an automobile accident; especially since the evidence showed that the dairy company furnished the motor truck, and the gas and oil used therein, and contracted to maintain the motor truck and keep it in good condition; the

same bearing the name of the Defendant dairy company. Clearly this case furnishes no support to the contention of the Respondent.

As we have already indicated, there are numerous cases from other jurisdictions where the facts involved are similar to those in the case at bar, and it was held that the relationship was that of independent contractor and not that of master and servant. We shall not attempt to cite all of these cases, but will refer to some of them.

The first case to which attention will be directed is the annotated Alabama case of *Aldrich v. Taylor Grocery Co.,* 206 Ala. 138, 89 So. 289, 17 A. L. R. 617, and the holding of the Court is correctly stated in the annotated syllabus as follows:

"A salesman employed on a commission basis, who owns and operates an automobile to assist him in seeking his trade, and whose movements are in no way controlled by his employer, is, with respect to the operation of the car, an independent contractor, so that his employer is not answerable for injuries caused by his negligent operation of the car."

The annotated Massachusetts case of *Khoury v. Edison Electric Illuminating Co.,* 265 Mass. 236, 164 N. E. 77, 60 A. L. R. 1159, is an important case decided by an eminent Court, and the Court's holding is accurately stated in the annotated syllabus as follows:

"An employer whose sole interest is that an employee shall be at places where work is to be performed, who leaves the means of transportation to the employee's decision and convenience, limiting his own liability for expense, if the employee uses his own car, to an amount equivalent to the fares of a common carrier, and who assumes no obligation to keep such car in repair, such duty resting upon the employee himself, is not liable as master under the principle of *respondeat superior* for injuries to a third person which result from the negligence of the servant in operating the car for a purpose in connection with his employment."

By analogy it will be observed, however, that the case at bar is considerably stronger in favor of the independent contractor relationship than the Massachusetts case, for in that case the employer was liable for the expense incurred, up to a certain amount, by the employee in his transportation, but there is no such liability here.

Some of the cases relate to insurance companies where the particular employment is quite similar to that in the case at bar, and for this reason they may be considered even more in point than some of the others. One of these is the annotated Pennsylvania case of *Wesolowski v. John Hancock Mut. Life Ins. Co.*, 308 Pa. 117, 162 A. 166, 87 A. L. R. 783, and the holding of the Court therein, in favor of the Defendant, may be seen by reference to two of the syllabi, which are as follows:

"An insurance company is not responsible for an employee's negligent operation of his automobile, by reason of the fact that he was on his way to make collections for the company, where the choice of means of transporting himself was optional with him."

\* \* \*

"To hold an employer legally responsible for the act of a servant who, while engaged in furthering the employer's business, negligently uses some instrumentality that carries him from place to place, it must either be proved that the master exercises actual or potential control over that instrumentality, or the use of the instrumentality at the time and place of the act complained of must be of such vital importance in furthering the business of the master that the latter's actual or potential control of it at that time and place may reasonably be inferred.

The following is from the opinion itself:

"The John Hancock Mutual Life Insurance Company employed Charles J. Adams to solicit life insurance business and to make weekly collections of premiums. His salary was $15.00 per week plus commissions on new business. His

territory was less than a square mile in the city of Philadelphia. The company had the right to Adams' exclusive services and to fix his working hours. In covering this territory, Adams sometimes walked and some times drove his own Ford car, which he maintained and operated at his own expense. The company did not require him to use a car, though the company's superintendent, when informed that Adams had a car, said, 'If you have one, you might as well use it.' "

The facts of that case are by no means as strong as those in the case at bar, for it will be observed that the Hancock Company (unlike the Company in our case) had a right to fix the working hours of the insurance agent, which is sometimes considered adverse to the independent contractor relationship. But the reasoning of the Pennsylvania Court in our opinion is quite sound, a portion of which appears as follows:

"In the case before us the defendant had no control over Adams' car. It was in no position to require him to use it, for the use of his car was no part of his contract of service. It could not direct him when, where, or how to drive his car. *It had no more control of Adams' car in which he transported himself than it had of the shoes he used in walking from patron to patron.*" (Emphasis added.)

The annotated New Jersey case of *Kohl v. Albert Lifson & Sons,* 128 N. J. L. 373, 25 A. (2d) 925, 140 A. L. R. 1146, is out of line with the cases above cited, but there is an important factual difference in this case from the case at bar, because in the New Jersey case the employee received a weekly allowance from the employer toward the expense of the operation and maintenance of the employee's automobile—a significant difference.

There is an elaborate annotation to this case commencing on page 1150 of 140 A. L. R. Many authorities on both sides of the controversial point before us are cited, stating the holding of the Courts.

Included in the cases cited in this annotation are a New York case and a Tennessee case to which brief reference will now be made. The New York case of *Dunne v. Contenti,* 256 App. Div. 833, 9 N. Y. S. (2d) 248, appears to be based on sound reasoning.

"The proof shows that Contenti owned the automobile and he alone paid for its maintenance and upkeep; and even though the defendant company knew he used it in and for his work, he was not required to use it and was free to choose his own hours of work. The company neither gave nor reserved the right to give Contenti any directions with reference to the manner in which he was to do his work, nor did it control or direct the operation of the automobile. At the time of the accident Contenti was an independent contractor and not the servant of the company."

The Tennessee case is that of *American Nat. Ins. Co. v. Poole,* 24 Tenn. App. 596, 148 S. W. (2d) 14, wherein it was held that the Company was not liable; and the facts therein are stated in the following quotation from the annotation aforesaid at pages 1155-1156 of 140 A. L. R.:

"The driver was employed by the defendant insurance company in a certain territory and he used his automobile in his work but was not remunerated therefor by the insurer, and his compensation consisted of a stipulated commission but the contract provided that the company should withhold his commission in the event his collection fell below a certain percentage and that his appointment might be revoked at the pleasure of the company, but the evidence was undisputed that he was free to employ his own method and determine his route of travel, as well as the hours during which contracts were made."

And we add the following important statement from the Court's opinion: "We think it may also be said that the trend of modern authority is against the hypothesis of agency and in favor of that of independent contractor."

Appellant's brief refers to the power of the Insurance Company to terminate the Defendant Ford's employment with

one day's notice as being a circumstance adverse to the independent contractor relationship, but this was the right of either party; even so, however, this standing alone is by no means sufficient as will be seen by reference to the following quotation from 27 Am. Jur., Independent Contractors, Section 21: "The relation between the parties is, however, to be determined from all the surrounding indicia of control, and the sole circumstance that the employer has reserved the right to terminate the work and discharge the contractor does not necessarily make the contractor a mere servant."

Among the cases cited in the foregoing annotation favorable to the relationship of master and servant instead of independent contractor is the Utah case of *Chatelain v. Thackcray,* 98 Utah 525, 100 P. (2d) 191, which is strongly relied upon by counsel for the appellant. The facts of this case were somewhat similar to those in the case at bar. But it seems to us that this case is definitely out of line with those hereinbefore cited and many others. Besides, "the very crux of the case" was the fact that the employee could not substitute another in his place without the consent of the employer. It is quite true that the Defendant Ford could not employ anyone to do his insurance work for the Liberty Life Insurance Company, as to which Mr. Ford was not an independent contractor; but since he was an independent contractor with reference to his personal transportation there is nothing whatever in the record which indicates that he had no right to use some other means of accomplishing his work such as employ someone to drive him in his own car, or in someone else's car, in his travels from place to place.

A case factually similar to the one at bar is the North Carolina case of *Pinnix v. Griffin,* 219 N. C. 35, 12 S. E. (2d) 667, in which, by a divided Court, the opposite view was taken to the holding herein, but it appears to me that the dissenting opinion in that case is much more logical than that of the prevailing opinion.

I have not overlooked the evidence that the Insurance Company deducted Social Security tax and withheld income tax from the commissions earned by the agent Ford. This testimony was not relevant, and I doubt very much if its admission was prejudicial. Neither have I overlooked the holding of this Court in *Carter's Dependents v. Palmetto State Life Ins. Co.*, 209 S. C. 67, 38 S. E. (2d) 905, and *Norris v. Bryant*, 217 S. C. 389, 60 S. E. (2d) 844. The *Palmetto Life case* was a Workmen's Compensation Case where there was evidence of control at all times, in that the agent was required to travel a definite route at a definite time and there was a letter in evidence referring to the agent as an employee. In *Norris v. Bryant*, it was held that upon the making out of a *prima facie* case the burden shifted to Defendant to show that the relationship was that of independent contractor and failure to produce the alleged servant as a witness gave rise to an inference against the claimed relationship. Here there was no failure to produce witnesses to this effect and hence no such presumption. Mr. Metz, who was manager of the Company's local branch, was placed upon the stand by Appellant who, of course, is bound by his testimony which, I am of the opinion, when considered in the light of the decisions of this Court, established the relationship of independent contractor. I am also of the opinion that the fact that the Company's local manager visted the scene of the collision in nowise altered the position of the parties. If Ford was their agent they were bound whether the manager visited the scene or not and, if he was not, this act on the part of the manager could not have created such an agency.

I have been unable to find any case wherein this Court has held an agency to have existed under facts comparable to those now before the Court. I, therefore, am of the opinion that the Order appealed from should be affirmed as to the Insurance. Company and reversed and remanded for a new trial as to the Defendant Ford.

BAKER, Chief Justice (dissenting).

In this case the opinions of Justices Stukes and Taylor correctly state the cause of action of the appellant, and I think in this action there can be no question but that the negligence of appellant's wife is imputable to him.

I regret that I cannot concur in either opinion. I have read the testimony of Mrs. Gillespie upon the trial of this case, and the only difference in her testimony in her suit and in the present case is that she testified in the present case that she at all times drove to the right of the center of the highway in the direction in which she was traveling, whereas in her case against the respondents here, appellants there, she testified that she may have been driving to the left of the center of the highway at the intersection. See *Gillespie v. Ford,* 222 S. C. 46, 71 S. E. (2d) 596. However, she still admitted that after looking to her left, the direction from which the respondent Ford was approaching the intersection of the highways, at approximately 100 feet before she reached the intersection, and not then seeing any traffic to her left, she looked no more in that direction but kept her eyes to the front and proceeded serenely at whatever speed she was traveling, the same being at the rate of approximately thirty miles per hour. While it was incidentally mentioned in said opinion that Mrs. Gillespie was driving slightly to the left of the center line, yet it is clear that the reversal of the judgment was bottomed upon her negligence in failing to again look before entering upon the intersection.

In the light of the opinion in *Gillespie v. Ford, supra,* I do not see how the trial Judge could have done other than grant the motion for a nonsuit. But if the Court is going to hold otherwise, then the case above referred to should be directly and not indirectly overruled.

If the Court is going to hold that this case should have been submitted to the jury, then I think it should have been submitted only as to Ford and the automobile, and not as against the respondent Liberty Life Insurance Company,

and I, therefore, will concur in the opinion of Mr. Justice Taylor in so far as it relates to the respondent insurance company.